1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| 7 LISA SHEPPARD, et al., | Case No.22-cv-03237-TLT |
| 8           Plaintiffs, | |
| 9     v. | **JUDGMENT** |
| | Re: Dkt. No. 91 |
| 10 COMPASS, INC., et al., | |
| 11           Defendants. | |

12

13          Having considered all the papers filed regarding Defendants' Motion to

14    Confirm the Arbitration Award (ECF No. 75), Plaintiffs' Motion to Vacate the

15    Arbitration Award (ECF No. 80), and for the reasons stated in this Court's

16    September 23, 2025 Order GRANTING Defendants' Motion to Confirm the

17    Arbitration Award and DENYING Plaintiffs' Motion to Vacate the Arbitration

18    Award (ECF No. 90):

19          **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

20          The Arbitration Award issued on July 2, 2025, by the AAA arbitrator in

21    the matter of *Sheppard v. Compass Inc. et. al.,* Case No. 01-23-0001-1678, a copy

22    of which is attached hereto as Exhibit A in ECF 91, is **CONFIRMED**.

23          The Clerk is directed to enter judgment in favor of Defendants and to

24    vacate all dates and close the file.

25          **IT IS SO ORDERED.**

26    Dated: September 30, 2025

27    _____
      TRINA L. THOMPSON
28    United States District Judge

United States District Court
Northern District of California

# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION TRIBUNAL**

|  |  |
|---|---|
| LISA SHEPPARD AND TODD SHEPPARD, | Case No. 01-23-0001-1678 |
| v. | FINAL AWARD |
| COMPASS, INC. et al., | |
| Respondents. | |

I, the undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above-named parties dated April 19, 2018, and having been duly sworn, and having heard the proofs and allegations of the parties do hereby render this FINAL AWARD as follows:

## I.    INTRODUCTION

This dispute arose from the rupture of the independent contractor relationship between Claimants Lisa Sheppard and Todd Sheppard (collectively, "Claimants" or the "Sheppards", individually "Ms. Sheppard" and "Mr. Sheppard") and Respondents Compass Inc. and its California entity, Compass California II (collectively "Compass"). At the April 28, 2025 final status conference in this matter, Claimants agreed to dismiss without prejudice the Compass entities they had initially brought claims against: Compass California, Inc. and Compass California III, Inc.

Pat Barrera of Barrera & Associates and Ashley Davenport of Davenport Law, PC represented the Sheppards.  Elliot C. Harvey Schatmeier and Kimmy Yu of Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, LLP ("Bird Marella") represented Compass.[1]

The evidentiary hearing took place from May 5-9, 2025 at the Los Angeles office of the American Arbitration Association ("AAA"), and continued over Zoom for a half day on May 15, 2025.

II.    JURISDICTION

Jurisdiction arises from the parties' arbitration agreement, which provides, *inter alia*:

> As permitted by law, all disputes between Broker and Agent
> will first be mediated by the American Arbitration Association
> ("AAA") under the Commercial Arbitration Rules and
> Mediation Procedures of the American Arbitration Association
> ("Rules") . . . .  Any dispute not resolved by Mediation
> will be settled by neutral binding arbitration in accordance
> with the Rules, as permitted by law.

§7(a)  of the Brokers' Terms of Engagement, incorporated by reference into the Sheppards' Independent Contractors Agreements ("ICA").

III.    THE PARTIES

Lisa and Todd Sheppard, a married couple, are both luxury real estate sales agents who have lived and worked their entire career in Sonoma County, California.  Ms. Sheppard specializes in properties in West Sonoma County, while Mr. Sheppard specializes in properties in Santa Rosa.  They formed a team called "Team Shep," although at the time

---

[1] Stuart D. Tochner, Chloe Chang, and Graham M. Helm of Ogletree Deakins Nash Smoak & Steward, P.C. previously represented Compass in this proceeding.  Bird Marella substituted as counsel for Compass on July 24, 2024.

period relevant to this dispute, they had decided to work separately. Ms. Sheppard associated with Compass on April 23, 2018 and disassociated with it on March 24, 2019. Mr. Sheppard associated with Compass on April 23, 2018 and disassociated with it on June 3, 2020.

Compass, Inc. is a real estate brokerage and technology company based in New York. Robert Reffkin is its Chief Executive Officer. Compass California II is the California affiliate of Compass, Inc. Compass expanded to the California market in 2016 and in 2018 entered the wine country of California, including Sonoma County.

## IV.    STATEMENT OF FACTS

### A.    Compass Recruits the Sheppards.

Natasha Pegnim, a Compass recruiter (strategic growth manager in Compass parlance) contacted Ms. Sheppard in early April 2018 to discuss the opportunity to join Compass as real estate sales agents. At the time, the Sheppards worked at Sotheby's corporate, which had an office located in the town of Sonoma. Ms. Sheppard found that location inconvenient for her West Sonoma County-centered work. Accordingly, she worked out of her home in Sebastopol, California. Ms. Sheppard testified that she loved everything about Sotheby's, except for the lack of an office convenient to her work. Mr. Sheppard worked from Sotheby's office in Sonoma.

Before associating with Sotheby's, the Sheppards worked for Pacific Union International ("PUI") in Sonoma County. PUI disassociated the Sheppards on January 15, 2011. The disassociation resulted from an incident between the Sheppards and a then-PUI agent, Jeff Bounsall, who accused the Sheppards of stealing one of his clients.

Ms. Sheppard testified that she liked what Ms. Pegnim told her about Compass. Specifically, that Compass was agent-centric, that the Sheppards would be wine country founding members, that they would receive equity as part of their compensation package, that Compass operated by the "three-yes rule," *i.e.*, before an agent joined Compass, he or she had to be approved by three current Compass agents, that the Sheppards would receive higher commissions than those they received at Sotheby's, and that they would receive enhanced support, at a ratio of one support staff to every seven to eight agents. The parties disagree about whether Ms. Pegnim told the Sheppards that the promise of enhanced support was for marketing support, or instead, for general support, including technology, marketing, and other ancillary services.  Ms. Pegnim also promised an office rent subsidy, which would continue until Compass located permanent office space in Sonoma County.   Ms. Sheppard convinced Mr. Sheppard to leave Sotheby's and join Compass with her.

On April 20, 2018, Ms. Sheppard brought up with Ms. Pegnim the following issues, based her lawyer's review of the "terms of engagement agreement":

- Could the place of mediation be changed from New York to California?

- How would Compass handle any pending transactions?

- Could the agreement state that a prevailing party in a dispute be entitled to attorneys' fees?

- Could the agreement be modified to require gross negligence for indemnification instead of simple negligence?

Ms. Pegnim emailed back a response from Compass' legal team to each of Ms. Sheppard's questions.  Ms. Sheppard wrote back, "Thank you for getting those answers to

us.  I don't see a problem going forward.  How do Todd and I sign this agreement?"  The

evidence shows that both Sheppards signed the ICAs on April 19, 2018.[2]

    B.   The Independent Contractor Agreement.

Pertinent to this dispute, the ICA set forth the following incentives for each of the

Sheppards:

- A marketing budget of $10,000 divided into quarterly installments;

- An office subsidy equal to $1,500 "in connection with Agent's occupation and use of a non-Broker operated space for the period beginning on April 23, 2018, and ending no later than April 23, 2019"

- An "equity stock option grant" consisting of "4 non-statutory stock options for the purchase of *common shares* of Urban Compass, Inc [Compass]. . . . to be granted at regular UC board meetings after the Association Date and the first 3 anniversaries thereafter.  The number of common shares available for purchase under each Option . . . equals (a) one-quarter of $10,000 *divided* by (b) the price per share ("the PPS") at which UC's *preferred* stock was most recently sold as of the applicable date of the grant . . . ." (emphasis in the original)

- Waiver of payment from April 20, 2018 to December 31, 2018 for an Errors and Omissions policy premium

- Upon Disassociation (voluntarily or for cause) prior to the second anniversary of the Start Date, Agent agrees to repay Broker all incentives, except Agent's Office Subsidy and Agent Split, received by Agent pursuant to the ICA[3]

The ICA also included an integration clause, which provided, *inter alia*:

> Notwithstanding anything in this ICA to the contrary,
> (a) this ICA constitutes the entire agreement between the parties . . .

---

[2] It makes no sense that Ms. Sheppard asked on April 20, 2018 how they could sign the agreement if they had signed the ICAs on April 19, 2018.  In any event, this discrepancy is immaterial, and the Arbitrator assumes that the representations in Ms. Pegnim's April 20, 2018 email preceded the Sheppards' execution of the ICAs.

[3] Mr. Sheppard signed a new ICA in 2019 that contained a different clawback clause.  It is addressed *infra*.

C.  <u>Office Space</u>.

The Sheppards placed great importance on being able to work from physical offices.  They had decided to have a "work divorce," which meant that Mr. Sheppard wanted an office in Santa Rosa, while Ms. Sheppard wanted an office in Sebastopol.

Compass did not have office space in Sonoma County when the Sheppards joined. Peter Jonas, the then-president of Compass West, testified that Compass would not open offices in new regions until the total gross commission income (GCI) of agents in that area justified an outlay for permanent space, and that the Sheppards' combined GCI alone was insufficient to justify a Compass office in Sonoma County.

On April 16, 2018, Ms. Pegnim emailed a summary of the Compass offer, which included an office subsidy of $1,500 which "will be provided to cover the costs of 2 private offices in Fountaingrove center." Her email hyperlinked to the Regus office space at Fountaingrove center in Santa Rosa.

Ms. Sheppard emailed Ms. Pegnim on April 17, 2018 a list of questions, including "What happens if there is still no office in a year?"  Ms. Pegnim replied that same day "If there is no office next year, we will extend the rent stipend for an additional year."

The Sheppards decided within a matter of days after joining Compass that they could not work at the Fountaingrove Regus office because it was too small for the two of them, Mr. Sheppard's assistant, and their sales manager, Kimiko Ages.  Ms. Ages searched for other office space, and within a week, located an office on Cleveland Ave. in Santa Rosa that both Sheppards could work from.  The Sheppards approved of the Cleveland Ave. office when they visited it.

The Cleveland Ave. office was unfurnished and lacked internet and office supplies. Compass ordered its standard furniture set from Cort furniture, but the Sheppards thought that the furniture was unsatisfactory.  They worked from the Cleveland Ave. office for a period of time, until they decided it was too unsafe.  A homeless encampment was across the street, and they saw needles strewn near the property.  Ms. Ages continued to actively search for new office space for them.

On August 30, 2018, Compass acquired PUI, a larger brokerage than Compass in California.  The acquisition meant that thousands of PUI sales agents, including Jeff Bounsall, became Compass sales agents.  The Sheppards objected to Compass allowing Bounsall to join, arguing that doing so violated the "three yes rule."  Compass responded that it could not bar Bounsall because the "three yes rule" did not apply to an acquisition of a brokerage.  It offered the Sheppards space in PUI offices in Sonoma and Healdsburg, but the Sheppards did not want to work out of PUI offices because of their conflict with Bounsall and the PUI manager who disassociated them.

Ms. Ages continued to look for an office for the Sheppards, locating an office on Pleasant Hill Ave. in Sebastopol, the town where the Sheppards live.  The Sheppards found that office satisfactory.  But on March 23, 2020, Compass closed the Sebastopol office after California Governor Gavin Newsom mandated a stay-at-home order due to the COVID-19 pandemic.  Compass laid off Ms. Ages when that office closed, and mandated that sales agents work remotely pursuant to Governor Newsom's order.

D.  The Kuleto Property Listing.

When Ms. Sheppard joined Compass, she brought a listing for the Kuleto estate on Sage Canyon Road in St. Helena.  The listing included Pat Kuleto's (a well-known restaurant designer) residence and an adjoining winery that Mr. Kuleto had sold to a prominent businessman, Bill Foley.  Ms. Sheppard testified that she had buyers who expressed an interest in buying the two properties as a package.  She testified that she had a verification of funds, that the basic terms of the sale had been agreed to, and that all systems were go.

The asking price for the June 16, 2018 Kuleto listing agreement was $30,000,000. William Dansberger, a PUI sales agent with experience selling wineries, co-listed the property with Ms. Sheppard.  Ms. Sheppard had never before sold a winery.

However, Ms. Sheppard learned from Ms. Ages, her sales manager, that she could not sell the Kuleto estate if it included the winery.  She did not learn until this proceeding that Compass did not carry E&O insurance covering commercial sales, and that precluded her ability to sell a property that included a winery.

Ms. Sheppard testified that her inability to sell the Kuleto estate was a huge disappointment to her.  She had been trying to "come off in a very good light with the Foley team" and if the sale had been consummated, it would have brought her business to "a totally different level."

Kathy Mehringer, Compass' broker of record and the Managing Director of Compliance and Risk Management, testified that Compass, a residential brokerage, did not at that time carry E&O insurance covering commercial transactions, and moreover, even if it had carried commercial coverage, she would not have approved the sale because Ms.

Sheppard lacked any experience selling commercial properties. Article 11 of the National Association of Realtors Code of Ethics provides that an agent may not act outside their areas of competency.

The prospective sale of the whole Kuleto Estate, including the winery, fell through. After Ms. Sheppard left Compass and rejoined Sotheby's, she sold the Kuleto estate on September 20, 2021, minus the winery, for $3,875,000.

E.  <u>The Dry Creek Road Listing</u>.

Ms. Sheppard met in October 2018 with the owners of 8207 Dry Creek Rd., Healdsburg, California, to discuss listing their property. She explained the benefits of listing with Compass, including its technology advantage. The owners, a couple from Texas, never had heard of Compass. When they searched online for Compass, they could not find its website.

It turned out that the owners were using Internet Explorer, a web browser scheduled by Microsoft to be retired. When Ms. Sheppard inquired why the owners had been unable to find a Compass website on Internet Explorer, she learned that Compass had not built a platform for that browser. Ms. Sheppard testified that the Dry Creek Rd. owners lost confidence in Compass and as a result, she lost the listing. Ms. Sheppard testified that she had planned to list the property at $2,998,000. Expecting to earn a 3% commission on that sale, she claims that she lost a $89,940 commission.

After leaving Compass and associating with Sotheby's, Ms. Sheppard co-listed and sold the Dry Creek Rd. property in July 2020 for $2,250,000, earning a 3% commission of $67,500.

F.  <u>Investments in Compass' Equity Program</u>.

When the Sheppards joined Compass, they each received a grant of four stock options.  The ICAs provided that these stock options would vest over four years "to be granted at regular UC [Compass] board . . .meetings."  As described *supra*, the stock options could be converted to common shares pursuant to a formula set forward in the ICA at §6.

In addition to this initial stock option grant, the Sheppards voluntarily elected in December 2018 to participate in Compass' Agent Equity Program ("AEP"), allocating 10% of their pre-tax commissions to the purchase of stock options.  In all, Mr. Sheppard allocated $31,043; Ms. Sheppard allocated $3,470.  Sales agents could view the status of their options and elect to exercise them when they vested by logging onto Solium, a third party equity management platform.

After Ms. Sheppard voluntarily disassociated from Compass on March 24, 2019, Compass agreed to reimburse her $3,470 allocation to the AEP by increasing Mr. Sheppard's commission split to 4% on the first five sales transactions he made after his April 22, 2019 renewal of the ICA.  Mr. Sheppard received approximately $10,325.81 in commissions due to this increase, $6,855.81 more than Ms. Sheppard's contribution.

Mr. Sheppard disassociated from Compass on June 3, 2020.  After he left Compass, his stock options expired.   Some options had not vested before Mr. Sheppard left Compass; others that had vested expired because he failed to exercise them by September 3, 2020, three months after he left Compass.  Compass allowed a sales agent to exercise options within three months after disassociating from Compass.

V.    PROCEDURAL HISTORY

This dispute has traversed numerous tribunals over the last four years.

The Sheppards initially filed a class action complaint against Compass in Sonoma County Superior Court on April 29, 2021, amending it on July 19, 2021.  They asserted causes of action for breach of contract, fraud, violations of Cal. Labor Code §2802, non-compliant wage statements, and violations of Cal. Bus. & Prof. Code §17200.  Compass removed the complaint on June 2, 2022 to the United States District Court for the Northern District of California, asserting diversity jurisdiction under the Class Action Fairness Act.  Compass simultaneously brought a motion to compel individual arbitration.

On February 24, 2023, the Honorable Trina L. Thompson, United States District Court judge, granted Compass' motion to compel arbitration, simultaneously staying the District Court action.  She severed as unconscionable two provisions in the parties' arbitration agreement:  one prohibiting the Sheppards from disclosing the existence of any mediation or arbitration arising out of or relating to the ICA without first obtaining Compass' written prior consent, and one requiring the Sheppards to pay up to 85% - 90% of arbitration costs.

On April 7, 2023, the Sheppards filed their arbitration demand against Compass, Inc., Compass California, Inc., Compass California II, Inc., and Compass California III, Inc.

The parties lodged no objections to the appointment of the undersigned Arbitrator, who convened a preliminary hearing on July 18, 2023.  The parties agreed that the AAA Commercial Rules (the "Rules") governed the proceeding, the Federal Arbitration Act applied to its procedure, and California substantive law applied to the Sheppards' causes

of actions.  The Arbitrator set a schedule for the entire proceeding, including a date by which Compass could bring a request to file a dispositive motion pursuant to Rule R-34.

Compass filed that request on August 11, 2023; the Sheppards opposed it one week later.  In its request, Compass sought to dismiss claims against Compass Inc., Compass California, Inc., and Compass California III, Inc., the Labor Code causes of action, the §17200, and the fraud causes of action.

The Arbitrator granted the Rule R-34 request as to the Labor Code causes of action, but denied the request as to the Compass entities, the §17200 claim, and the fraud causes of action.  With respect to the §17200 cause of action, she found that California law allowed the pursuit of alternative remedies at the pleading stage.  With respect to the fraud cause of action, she found that the Rules, not the Federal or California Rules of Civil Procedure, governed pleading, and that the Sheppards had adequately pled fraud.  As to the dismissal of several of the Compass entities, she found that the Sheppards had adequately pled that the various Compass entities operated as a joint enterprise so as to be jointly liable for any purported damages.[4]

Compass subsequently filed a motion to dismiss the Labor Code causes of action. Rather than engage in briefing, the parties stipulated on October 27, 2023 to dismiss the Labor Code causes of action with prejudice.

---

[4] As stated *supra*, at the final status conference, Claimants dismissed without prejudice Compass California, Inc., and Compass California III, Inc.

Pursuant to Rule R-31, the Arbitrator adjourned the evidentiary hearing scheduled for May 6-10, 2024 due to an unavoidable conflict, and rescheduled it for December 2-6, 2024.

In September 2024, after several requests made by the AAA case manager to Compass' counsel to pay the scheduled deposit for the Arbitrator's compensation, Compass requested that the Arbitrator require that the Sheppards pay half of the remaining deposit, arguing that because the parties' arbitration agreement called for the application of the AAA Commercial Rules, the fee schedule of those Rules should apply. The Rules call for the parties to share equally the Arbitrator's compensation.

The Arbitrator denied Compass' request for several reasons.  First, the AAA applies the employment fee schedule to all employment disputes, regardless of whether the parties' arbitration agreement calls for the application of the commercial or the employment rules.  The AAA Administrative Fee Schedule for employment disputes provides that the employer must "pay the arbitrator's compensation unless the individual, post-dispute, voluntarily elects to pay a portion of the arbitrator's compensation."  The Sheppards had not so agreed.

Second, Judge Thompson had severed as unconscionable the provision in the parties' arbitration agreement requiring the Sheppards to pay 85-90% of the costs of the arbitration.    Compass agreed at that time that the provision should be severed, representing to the court that Rule 44 of the AAA Employment Rules would apply, specifically, that the Sheppards would not be required to pay the arbitrator's compensation.

Respondents did pay the invoice for the Arbitrator's compensation – but eight days after it was due.  On that basis, the Sheppards terminated the arbitration and returned to Federal District Court pursuant to Cal. Code of Civ. Proc. §1281.98, which requires an employer to pay arbitration fees within thirty days of the due date.  Section 1281.98 provides that should the employer fail to timely pay, it is in material default of the arbitration agreement "and waives its right to compel the employee . . .to proceed with that arbitration as a result of the material breach."  The employee then has the option to terminate the arbitration and proceed in a court of appropriate jurisdiction. *See* Cal. Code of Civ. Proc. §1281.98(b).

The Sheppards requested that the court lift the stay of arbitration and compel Compass to pay their attorney's fees and costs.  Compass responded with a motion to compel arbitration.  Judge Thompson granted Compass' motion, holding that the Federal Arbitration Act preempted §1281.98 because the code section violated the equal-treatment principle, *i.e.,* it impermissibly rendered an arbitration provision unenforceable on arbitration-specific grounds.  She further found that Compass' eight-day late payment did not materially breach the arbitration agreement, nor did Compass waive its right to arbitrate by its late payment.

Judge Thompson denied the Sheppards' request for attorney's fees and costs.  She lifted the stay, ordered a revised case management schedule, and further ordered the parties to proceed with arbitration "at the earliest date possible."

The Arbitrator subsequently convened a status conference, at which the parties agreed that the hearing would be held in Los Angeles, California on May 5-9, 2025.

Prior to the hearing, the Sheppards asked the Arbitrator to issue a subpoena for the hearing testimony of Compass' CEO Robert Reffkin, arguing that he had unique knowledge of Compass' recruitment of the Sheppards and the complaints they made during the time they were associated with Compass. Compass objected based on the *Apex* doctrine, as articulated in *Liberty Mut. Ins. Co. v. Sup. Ct.,* 10 Cal. App. 4th 1282 (1979).

At the final status conference held on April 28, 2025, the Arbitrator ordered the parties to brief the issue. Based on a review of the law and the evidence, the Arbitrator found that the *Apex* doctrine applied to Mr. Reffkin. She specifically found that Mr. Reffkin did not possess unique or superior information relevant to the case, nor did he possess information not available though any less intrusive means. The evidence showed that Mr. Reffkin acted as a "cheerleader" in the recruitment efforts, enthusiastically selling his company's promise to the Sheppards.

The Sheppards were on the receiving end of those communications, and could testify about them. She also found that the evidence showed that Mr. Reffkin delegated responses to the Sheppards' complaints to others, including Mr. Jonas, who testified at the hearing about Compass' responses to the Sheppards' complaints.

On May 3, 2025, the Saturday before the scheduled hearing, the Sheppards' counsel requested an adjournment of the hearing. First, he argued there was "newly discovered evidence" that Compass should have produced. But upon review of this "newly discovered evidence," the Arbitrator determined that it had not come from Compass' files. Instead, it had come from Ms. Sheppard's files, and in fact, should have been produced by her to Compass. The evidence consisted of a number of emails to the Sheppards from Ms.

Ages.   Because the Sheppards had failed to list Ms. Ages as a custodian for the ESI search, Compass had not searched her files.

Second, the Sheppards' counsel argued that Ms. Ages was not available during the week of the hearing.  The Arbitrator responded that an additional day during the week after the hearing  could be scheduled for Ms. Ages' remote testimony, which in fact is what occurred.  Finally, counsel argued that Ms. Sheppard's father had just died, and although she could "power through" the hearing, it would be unfair to require her to do so.  The Arbitrator responded that Ms. Sheppard would not be required to testify during the live hearing; her testimony could be taken remotely on the same day as Ms. Ages' testimony.

The hearing occurred as scheduled from May 5-9, 2025, with Ms. Sheppard testifying live.   Ms. Ages (and Mr. Jonas) testified remotely the following week, on May 15, 2025.

## VI.    THE PARTIES' CONTENTIONS

The Sheppards contend that Compass fraudulently induced them to sign the ICA by promising dedicated marketing, physical office space, stock in the company, founding members' status, with the ability to veto new sales agents pursuant to the "three yes policy", and representing that Compass was technologically superior to other brokerages. Based on these promises, they agreed to join Compass.

The Sheppards contend that the reality was quite the opposite:  Compass' marketing was poor and untimely and they did not get a dedicated marketing person; they were not provided with physical office space; they received no stock; Compass allowed Jeff Bounsall to join over their objections; and Compass' technology proved to be

inadequate, as demonstrated by its failure to have a platform on the Internet Explorer browser.  Accordingly, they assert a claim for fraudulent inducement and seek to rescind the ICAs.   They contend that the fraud continued after they joined because Compass "knowingly made material, false statements that were intended to influence the Sheppards' decision to take part in the AEP (Agent Equity Program)."   They also contend that Compass committed fraud by promising them physical office space but failing to do so.

The Sheppards also contend that Compass breached the ICA by failing to supply a dedicated marketing agent, failing to give them Compass stock, not paying them higher commissions as promised, failing to pay Mr. Sheppard $3000 of commissions on the sale of a Newanga Ave. property, and failing to provide them with two physical offices.  Finally, the Sheppards contend that Compass violated §17200.

Compass contends that it made no false promises to the Sheppards.  Compass contends that it told the Sheppards they would receive a rent stipend until Compass could locate permanent office space, and they did provide a rent stipend and then paid rent on office space when the Sheppards declined to sign leases in their names.  Compass further contends that it never represented that the Sheppards would receive stock; instead, they were told repeatedly that they would receive equity in the form of stock options, which is what they received.

Compass also contends that it told the Sheppards they would receive dedicated support, including technology, marketing, and accounting support, but not specifically dedicated *marketing* support.  It contends that it had no obligation to build a platform on

Internet Explorer, a browser that Microsoft planned to retire.  Compass contends that it made no false statements related to the AEP, a voluntary program.  Compass contends that it adhered to the ICA's terms and did not breach any of its provisions.  Finally, it contends that because the Sheppards' underlying claims fail, so too must their § 17200 cause of action.

These contentions are analyzed below.

VII.    ANALYSIS

A.    <u>Fraudulent Inducement</u>.

To prevail on their claim for fraudulent inducement, the Sheppards must prove, by a preponderance of the evidence, that:  Compass i) made a misrepresentation to them; ii) knowing it was false; iii) with the intent to induce their reliance; iv) upon which they justifiably relied; and v) they suffered damage as a result of the misrepresentations.  *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

To prevail on their claim for fraudulent misrepresentation, the Sheppards must prove *each* of these elements by a preponderance of the evidence.  In other words, if the Sheppards fail to meet their evidentiary burden on any one of the elements, the entire cause of action fails.  But if they do meet their burden of proof on all of the elements of a claim for fraudulent inducement, the Sheppards would be entitled to rescind the ICA.  *See* Cal. Civil Code §1689(b)(1).

18

The Sheppards have identified eight purported misrepresentations they allege Ms. Pegnim made that induced them to join Compass.[5] Each of the purported misrepresentations is described *infra,* followed by the Arbitrator's analysis of the evidence as to that specific purported misrepresentation. These purported misrepresentations must have been made *before* April 19, 2018, the date the Sheppards signed the ICAs; the claim for fraudulent inducement arises from the contention that Compass induced them to sign the ICA by making false promises. *See Lazar,* 12 Cal. 4th at 638 ("An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to *enter into a contract* (citations omitted)" (emphasis added).

As set forth below, the Sheppards' testimony, based on their recollection of events that occurred more than six years ago, conflicts with contemporaneous writings as well as the testimony of other witnesses. The Tribunal finds contemporaneous writings to be more reliable than testimony about events that occurred a number of years prior.

Because the Sheppards have failed to meet their burden of proof on the fraudulent inducement cause of action, for the reasons stated *infra*, the Tribunal declines to rescind the ICA.

    1.  *The purported promise of higher commissions*.

The Sheppards allege that Ms. Pegnim promised them higher commissions than those they had earned at Sotheby's; specifically, 92% from every real estate transaction

---

[5] The Sheppards have continually emphasized Mr. Reffkin's and Ms. Pegnim's lack of real estate backgrounds. However, whether or not these individuals had real estate backgrounds bears no relevance to the asserted claims. There is no allegation that Compass is not a legitimate real estate brokerage because its founder did not have a background in real estate, or that it committed fraud by hiring recruiters without real estate backgrounds. Nor is there any evidence that either individual misrepresented their backgrounds.

they handled.  On April 16, 2018, Ms. Pegnim emailed the Sheppards a "recap of the offer we discussed".  She stated that the commission split would be 92% which would "be reflected as a base split of 85%, plus a 7% per-transaction "incentive split" bonus.  This will include the flat 4% resource fee."

When she received the ICA, Ms. Sheppard noted in an email dated April 17, 2018 that the commission split seemed "changed on the agreement" and thus, they were confused.  The ICA provided that the 4% resource fee would in fact be deducted from their gross commissions.  Ms. Pegnim responded the same day that "I meant on top off [sic] and in addition to the split but I can see how that could be confusing, my apologies.  The ICA Agreement is correct.  **keep in mind what your current fee is as ours tends to be on the lower end**"

Ms. Sheppard signed the ICA on April 19, 2018, as did  Mr. Sheppard.  Ms. Sheppard's testimony actually corroborates that she understood from Ms. Pegnim's April 17th email that the net commission split would be 88%, three points higher than her Sotheby's commission of 85%:

> So it was explained to me  - -  it was - - this is a little bit confusing.
> And there was an email from me to Natasha talking about this.
> So it was my understanding that I would be paid a base split of
> eighty-five percent, plus seven percent, but then it's taking out
> four percent for a resource fee.  So it would be ninety-two
> minus four, so it would actually be eighty-eight percent.

Based on the April 17, 2018 email exchange, and Ms. Sheppard's own testimony of her understanding of the commission split, there is no evidence that Ms. Pegnim, on behalf of Compass, misrepresented the commission split.  The Sheppards were paid a commission three points higher than what they were paid at Sotheby's.

2. *The purported promise of two staffed, functioning offices (encompassing two purported promises).*

The Sheppards testified that Compass promised them two staffed, fully functioning offices – one in Santa Rosa for Mr. Sheppard, and one in Sebastopol for Ms. Sheppard.  Ms. Sheppard testified:

> So from the very first conversation I ever had with Natasha to the conversations that included Kimiko and Natasha, the focus was around we wanted offices . . . . And we were told over and over:  "We want to have an office in Santa Rosa.  Todd can work there.  You want to have an office in Sebastopol.  You can work there. . . . And this is something, not only are we going to be putting together, but we're actively looking to put together now. . . ."  We were told these spaces would be in place within six to twelve months.

Mr. Sheppard testified about the importance of office space to them, but he did not testify about any promises made prior to their signing of the ICAs:

> We had regular conversations about – especially in the early days
> of being at Compass, of, like, we got to the office and it
> was almost – not a running joke, but it was a standing kind of,
> like, conversation, 'what things have Compass
> done that are going to make challenges for us today?'

Neither Sheppards testified that Compass promised them permanent office space before they signed the ICAs.  Ms. Sheppard instead testified how important office space was to them and that Compass told her:  "we're actively looking to put together now."

And in fact, that is what occurred.  When the Regus space proved unsatisfactory to the Sheppards, Ms. Ages found them space at Cleveland Ave. in Santa Rosa.  When that proved unsatisfactory to the Sheppards, she located space in Sebastopol.  Compass also offered the Sheppards space at the PUI offices in Sonoma and Healdsburg, which they

rejected based on their issues with a PUI manager and Bounsall.  That all occurred *after* they signed the ICAs.

Focusing on the promises made *before* they signed the ICAs, the only promises that are relevant to the Sheppards' claim of fraudulent inducement, the evidentiary record is unambiguous.   Compass (through Ms. Pegnim) stated clearly that the Sheppards would receive a rent stipend, initially for space at Regus.

In her April 16, 2018 email recap of Compass' offer, Ms. Pegnim wrote:

- Office subsidy

    o   Monthly amount of $1500 will be provided to cover
        the costs of 2 private offices in Fountaingrove center
        [Regus office space]

On April 17, 2018, Ms. Sheppard emailed Ms. Pegnim:

> We would like to renegotiate the office subsidy payment if we
> for some reason don't stay with Compass for 2 years.  Since
> we are only asking for this since there is no office to go to currently,
> can that be taken out of the payback clause? . . .

Ms. Pegnim responded:  "This is a fair and reasonable request."

In the same email exchange, Ms. Sheppard asked:  "What happens if there still is no office in a year?"  Ms. Pegnim responded:  "If there is no office next year, we will extend the rent stipend for an additional year."

Ms. Sheppard testified that she understood that they would receive a rent subsidy of $1500.  Ms. Ages also testified that this was the understanding prior to the execution of the ICAs:

> I think just that – that they wanted an office, and just explaining
> the process for building out a formalized office, but we were able to
> offer a rent stipend within their agreement.

As stated *supra*, the Sheppards signed the ICAs on April 19, 2018, two days after the foregoing email exchange with Ms. Pegnim.  This evidence shows that they were fully aware that Compass' promise was for *rent stipends*, not two offices.

There is ample evidence  that the lack of two offices greatly aggrieved the Sheppards.  Ample evidence also shows that Ms. Ages expended significant time searching for office space for them, first locating an office on Cleveland Ave, then in Sebastopol.  Compass also offered them space at the PUI offices in Sonoma and Healdsburg.  But all of that occurred after they signed the ICAs,[6] and thus is irrelevant to the question of whether Compass fraudulently induced the Sheppards to enter into the ICAs by promising them two physical offices, one in Santa Rosa and one in Sebastopol.

   3. *The promise of dedicated marketing support.*

The Sheppards contend that they were promised dedicated marketing support.  The evidentiary record on this issue is conflicted.  Ms. Sheppard testified that Ms. Pegnim promised one marketing agent for every seven to eight sales agents.  Ms. Ages testified that she  herself had made no such promise, but that Ms. Pegnim did.  Ms. Ages testified that she told Ms. Pegnim that she should not make that promise.  Ms. Ages testified that Compass hired a dedicated marketing person eight months to a year after the Sheppards joined, but that person supported all Compass agents in wine country.

Ms. Pegnim testified that she did not believe that she made any such promise, but did not affirmatively deny doing so.  Mr. Jonas testified that although the Sheppards "heard" one marketing support person for every seven to eight agents, what actually was

---

[6] Nor did it constitute fraud, addressed *infra*.

promised was multi-faceted support, including technology, IT, and marketing.  Mr. Jonas was not involved in the Sheppards' recruitment, so the Tribunal places no weight on his testimony.  No documentary evidence exists one way or the other.

The Tribunal places the most weight on Ms. Ages' testimony.   Ms. Ages was specific:

> After the meeting with Lisa, I pulled her [Ms. Pegnim]aside
> and I said, I don't think you should say that.  I don't think
> that's true.  At this moment that's definitely not true
> and it's going to cause issue [sic] later on.  And she said,
> Don't worry.  This is what I've been told to tell the agents.

Ms. Ages further testified that after this discussion, Ms. Pegnim did not invite her to any more recruiting meetings.  From this testimony, the Tribunal concludes that Ms. Pegnim promised dedicated marketing support when recruiting the Sheppards.  That promise constituted a misrepresentation upon which the Sheppards relied.

However, the inquiry of whether this is sufficient to prove fraudulent inducement does not end with proving that a misrepresentation occurred.  The Sheppards must prove that the misrepresentation resulted in damage to them.  *See Beckwith v. Dahl*, 205 Cal. App. 4th 1038, 1064 (2012) ("'In an action for [common law] fraud, damage is an essential element of the cause of action.' [Citation omitted] 'Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages.' [citation omitted]".

Although the Sheppards experienced substantial frustration from the lack of dedicated marketing support, they have failed to adduce any evidence that they lost a listing, or failed to sell a property because of the lack of dedicated marketing support.  They

do not claim that they lost the Kuleto estate listing or the Dry Creek Rd. listing (or any other listing) or that they could not sell properties they did list because they lacked dedicated marketing support.  Because the Sheppards bear the burden of proof, this failure is fatal to their claim for fraudulent misrepresentation based on the misrepresentation of dedicated marketing support.

4.    *The purported promise of Compass stock.*

The Sheppards' contention that they were promised stock, not stock options, is contradicted by reams of evidence, including their own testimony.

Ms. Sheppard testified:

> So my understanding of this was we were being – as part of our compensation package, when we were being recruited, that we were going to be given this – the stock.  The stock was going to be bought at 10,000 dollars worth, *whatever the strike price was*, and it would be granted to us the day that we joined Compass. (emphasis added).

Of course, stock does not have a strike price; stock options do.

Mr. Sheppard testified that "I *thought* they were giving us as a signing bonus $10,000 worth of stock (emphasis added)."

The Sheppards' confusion about what form of equity[7] Compass offered them was contradicted by Ms. Ages, who testified that "I don't know theirs particularly [offer of equity upon signing], but that was part of the recruiting was that they would get a stock option."

---

[7] Employee stock options are a form of equity.  Investopedia defines an employee stock option as "a type of equity compensation granted by companies to their employees and executives.  Rather than granting shares of stock directly, the company gives options on the stock instead."  Investopedia, *"Employee Stock Options (ESOs):  A Complete Guide*, by Elvis Picardo, updated September 10, 2024.

It's also contradicted by contemporaneous writings.  Ms. Pegnim's April 16, 2018 email to Ms. Sheppard stated:

- Equity Grant:  $20,000

    o This will be an equity grant *in the form of Compass stock options* (emphasis added)

Ms. Pegnim also sent the Sheppards the ICA to review before they signed it.  The ICA provides:

"<u>Equity Stock Option Grants</u>":  Agent will be granted up to 4 non-statutory stock options for the purchase of *common shares* of Urban Compass, Inc. ("UC") (each, an "<u>Option</u>") under UC's 2012 Stock Incentive Plan . . . .

Although not relevant to their fraudulent misrepresentation claim, it is notable that had Mr. Sheppard exercised his vested stock options within 90 days of disassociation, as Jane Quach of the Compass equity team informed him on June 5, 2020 (two days after he disassociated) he would have been issued shares of Compass stock.

And that would not have been difficult.  Mr. Sheppard had access to the Solium platform, which displayed all the information needed to exercise the options.   The Sheppards' own witness, Mindy Ni, who also has brought a claim (on different grounds) against Compass, testified that she easily used Solium to exercise her options upon disassociating from Compass.  She testified that she logged onto Solium and "there's, like, a click.  You just click the button.  They're saying that, exercising the option."

5.  *The purported promise of E&O coverage for commercial sales.*

The Sheppards rely on a statement in Ms. Pegnim's April 20, 2018 email to support their contention that they were misled into believing that Compass' E&O policy covered commercial, in addition to residential, sales.  But that reliance is misplaced.

The evidence shows that Ms. Sheppard's lawyer reviewed the ICA, and he "had a couple of comments" which Ms. Sheppard conveyed to Ms. Pegnim.  One related to the scope of the E&O policy:  "This agreement says just simple negligence requires indemnity and we would ask to modify this to gross negligence?"  Ms. Pegnim responded:

> Like I mentioned above, these terms apply broadly to all agents
> and should not be modified.  I would explain that we have a
> broad E&O policy, and this refers narrowly to situations
> where E&O does not cover the agent's negligence.

Ms. Sheppard's lawyer's question and Ms. Pegnim's response makes clear that the issue being addressed was the scope of the E&O policy as it pertains to an agent's negligence, not whether it included commercial coverage.  There is simply no reference to whether the E&O policy covered commercial in addition to residential sales.  Ms. Sheppard might have assumed that it did.  But an assumption is quite distinct from a false promise.[8]

Compass did not misrepresent the scope of its E&O policy.

6.  *The purported promise of founding member status and the three yes rule.*

On April 6, 2018, Ms. Pegnim emailed the Sheppards:

> It was such a pleasure meeting you today.  After meeting you
> I am even more confident you'd be a great fit for Compass and

---

[8] In support of their contention that Compass falsely represented the scope of its E&O policy, the Sheppards cite to Mr. Jonas' testimony that he understood that some Compass agents were selling wineries in 2018.  Even if that testimony is accurate, it is irrelevant.  Mr. Jonas was not involved in recruiting the Sheppards; he could not have made any representations to them that induced them to join Compass.

be apart [sic] of our founding team in Sonoma County.

Mr. Sheppard testified:

> She was describing us being – being identified as founding
> members and our involvement in growing – helping
> grow the – the region, networking with other agents
> and picking our co-workers.  She described the three-yes
> rule as far as the - - the hiring process.

The Sheppards *were* some of the first Compass agents in wine country.  Ms. Pegnim did not misrepresent their status.

The Sheppards' main issue is that they contend they were told Compass maintained a "three yes" rule that would allow them to veto any new agents Compass intended to hire.  They were especially upset that their nemesis Jeff Bounsall associated with Compass over their vociferous objections.

But Bounsall came to Compass as part of the acquisition of PUI, an acquisition that brought thousands of PUI agents into Compass, and greatly expanded its footprint in California.  Ms. Ages testified that "I don't know if the Three U Agreement – or Three Yes Agreement had anything to do with mergers."

The Sheppards have not proved that Compass misrepresented their founding status or the "three yes" rule.

7. *The purported promise of new technology.*

The Sheppards' main complaint about Compass' false promise of new technology is that Compass did not have its website available on the Internet Explorer browser, which caused them to lose a listing for the property on Dry Creek Road (which Ms. Sheppard later sold after disassociating from Compass).

28

But there is no evidence that Compass promised when it recruited the Sheppards that it would have its website available on every single browser. Technological superiority does not mean that Compass is required to maintain a platform on every browser, particularly one with a miniscule market share. According to Mr. Reffkin, Internet Explorer's market share amounted to 1%.

As stated *supra*, the Sheppards must show that they suffered damage from any misrepresentation. Even had Compass misrepresented its technological superiority, any damage resulting from that misrepresentation is highly speculative. The Dry Creek property sat on the market for 637 days when a subsequent agent listed it on October 24, 2018 for $2,998,000. Ms. Sheppard got the listing, and finally sold it on July 22, 2020 (after disassociating from Compass) for $2,225,000, only after multiple price reductions.

The Sheppards have not proved that Compass' representation of technological superiority was false.

     B.    <u>Fraud</u>.

       1.   *The AEP program.*

The Sheppards allege that Compass committed fraud by misrepresenting the AEP program. Because Compass offered the AEP program after the Sheppards joined, it is analyzed here, rather than as part of the claim for fraudulent inducement, which as described *supra*, only examines representations made before April 19, 2018.

To prevail on their claim for fraud, the Sheppards must prove by a preponderance of the evidence that i) Compass misrepresented the AEP program; ii) with knowledge that its representation was false; iii) intending to induce them to participate in the AEP

29

program; iv) they justifiably relied on the misrepresentations; and v) suffered damages as a result. *See Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 979 (1997). As with their fraudulent inducement claim, the Sheppards must meet their burden of proof on each of these elements.

Relying on their expert Joe Emmanuele, the Sheppards contend that the formula set forward in the ICAs was fraudulent. Emmanuele testified that the formula was fraudulent because Compass was "pricing something based on the price of something other than what they're buying." Compass used the most recent price per share of its preferred stock to calculate "[t]he number of common shares available for purchase under each Option . . . ."

But Emmanuele cited no rule or law that prohibited Compass from using the most recent price of its preferred stock to determine the *number* (not the price) of common shares available for purchase upon the exercise of an option.

The fact that the formula was fully disclosed and not prohibited by law defeats any allegation that Compass misrepresented the AEP program. Compass provided the AEP Participation Agreement to the Sheppards in advance of their participation. That agreement stated that the number of options granted to them would be calculated based on the preferred stock price. The agreement also advised that the Sheppards should contact a financial advisor. The Sheppards did not do so. An FAQ provided an illustrative example of how the calculation worked, and the reasons why Compass calculated the number of shares for each option based on the preferred share price. To the extent the Sheppards did not understand or objected to the formula, they could have sought advice

from a financial advisor or else declined participation in the AEP program. It was entirely voluntary.

The Sheppards have failed to meet their burden of proof that Compass misrepresented the AEP program.

2. *Office Space*.

The Sheppards were highly aggrieved by the lack of two physical offices, one in Santa Rosa and one in Sebastopol. But they can point to no misrepresentation made after they joined about office space.

As recounted *supra,* Ms. Ages, their sales manager, went to extraordinary lengths to locate office space for them. When the Regus space at Fountaingrove proved unsatisfactory, she located space on Cleveland Avenue in Santa Rosa, which the Sheppards at first approved. When that proved unsatisfactory to them, she continued to search, ultimately locating space on Pleasant Hill Ave. in Sebastopol. Compass closed the Sebastopol office only after Governor Newsom issued a COVID-related stay-at-home order.

Moreover, after the PUI acquisition, Compass offered the Sheppards space in the PUI offices in Sonoma and Healdsburg. The Sheppards turned down this offer based on their discomfort with their former PUI manager and with Bounsall.

There is no evidence other than Ms. Sheppard's own testimony that Compass promised that two offices would be in place within six to twelve months. Ms. Ages testified that she did not recall ever making that promise. Instead, she testified that she told them they would have temporary office space until Compass opened a permanent office.

Because the Sheppards have failed to prove that Compass made any misrepresentations to them about the AEP or permanent office space, their claim for fraud fails.

C.    Breach of contract.

Because the Sheppards did not prevail on their cause of action for fraudulent inducement, the ICAs remain valid.  The Tribunal next turns to the Sheppards' claim for breach of contract.

To prevail on their claim for breach of contract, the Sheppards must prove by a preponderance of the evidence i) the existence of the contract; ii) their performance of the contract or excuse for nonperformance; iii) Compass' breach; and iv) the resulting damage to them.  *See Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

The Sheppards do not dispute the existence of the ICA.  Compass does not allege that the Sheppards did not perform their obligations under the ICA.  The only elements of this claim in dispute are whether Compass breached the ICAs, and if so, whether the breaches caused the Sheppards damage.

To determine whether Compass breached any provision in the ICA, the Tribunal examines the black and white language in the ICA.   The starting point is the integration clause, which provides, *inter alia*:

> Notwithstanding anything in this ICA to the contrary, (a) this ICA
> constitutes the entire agreement between the parties . . . .

ICA at p. 1.

Absent a showing of fraud, California upholds integration clauses such as the one contained in the ICA.  *See  Riverisland Cold Storage v. Fresno-Madera Production Credit*

*Ass'n,* 55 Cal. 4th 1169, 1182 (2013).  Because the Sheppards have failed to prevail on their fraud causes of action, the Tribunal must uphold integration clause.  Thus, the Tribunal may not consider any parol evidence (*i.e.* extrinsic evidence) that may contradict the actual terms of the ICA.

The ICA is unambiguous.  Under California law, even where an agreement is "plain and unambiguous on its face," a party may introduce extrinsic evidence "to prove a meaning to which the language is reasonably susceptible." *PGE v. Drayage*, 69 Cal. 2d 33, 37 (1968).  As analyzed below, the Sheppards have introduced no extrinsic evidence that proves a meaning to which language in the ICA is reasonably susceptible.

1.   *Commissions.*

The ICA set forth Compass' obligation to pay commissions:

> **"Agent Split":**  85% of gross commissions received by the Broker from transactions *procured and closed* by Agent during the period beginning on April 20, 2018 and ending April 19, 2019  (emphasis added).

> **"Incentive Split":**  Agent shall receive a 7.00% incentive split added to the Agent Split for the Initial Term. . . .

> **"Resource Fee":**  Agent shall receive a 7.00% incentive split added to the Agent Split for the Initial Term.

> ICA at §§ 1, 2, 5.

Compass paid the Sheppards commissions in full based on transactions they procured and closed.  The Sheppards do not allege otherwise, except with respect to Mr. Sheppard's Newanga transaction, which is addressed *infra* in the discussion of the clawback provision.  The evidence, as described *infra*, is that Compass either paid him  that commission or else he agreed to use the commission as a setoff for the clawback of

incentives he owed Compass upon his disassociation.  So there could not be a breach of the ICA's commission provision.

Instead, the Sheppards complain about listings they allege they lost:  the Kuleto estate (including the Foley winery) and the Dry Creek listing.  But they did not close those transactions, so Compass did not breach the ICA by failing to pay them commissions.  Their complaint about these listings arises from their allegations of fraudulent inducement (the lack of E&O policy with respect to the Kuleto listing, and the lack of access to Internet Explorer with respect to the Dry Creek listing).  The Tribunal addressed those allegations *supra*, finding no fraudulent inducement.

No extrinsic evidence has been introduced that allows the Tribunal to consider an alternate meaning to the explicit language in this provision of the ICA.

2.  *The Rent Subsidy.*

The ICA provided that Compass would provide "a monthly stipend equal to $1,500 . . . ."  *ICA* at § 4.  That's what Compass did, until the Sheppards objected because they did not want a lease in their names.  Instead, Compass paid the amount directly for leased space.  Compass did not breach the ICA with respect to the rent subsidy.

The Sheppards are really complaining about the failure to procure two offices for them, which they insist Compass promised (although, as described *supra*, they failed to prove).  But the only evidence of this alleged promise is their own testimony.  More importantly, because the ICA is an integrated contract, any extrinsic evidence is inadmissible.

The Sheppards have adduced no extrinsic evidence to prove that there is a meaning to this provision other than what it plainly states.

Compass did not breach the ICA's Office Subsidy provision.

3.  *The Equity Stock Option Grants.*

The Sheppards allege that Compass breached the ICA by failing to provide them with stock.  But the ICA explicitly stated that they will be provided with stock *options*:

> "<u>Equity Stock Option Grants</u>":  Agent will be granted up to 4 non-statutory stock options for the purchase of *common shares* of Urban Compass Inc. [Compass]  . . . .

ICA at §6.

And that is exactly what they received.  The evidence is that the Sheppards did not really understand what stock options are or how they differed from common stock.  But that misunderstanding does not mean that Compass breached the ICA by providing them with stock options, which is what the ICA states plainly they would receive.  As stated *supra*, the term "equity" includes stock options as well as stock.

The Sheppards' misunderstanding is simply that.  It is not extrinsic evidence that is relevant to prove a meaning to which the ICA's provision on stock options is reasonably susceptible.

4.  *The Marketing Budget.*

The Sheppards contend that Compass breached the ICA by failing to provide one marketing person for every seven agents.  But the ICA nowhere provides that they would receive a dedicated marketing person.  Instead, it provides:

> "**Marketing Budget**":  $10,000 in the aggregate for the
> Initial Term, granted to the Team, divided into quarterly
> installments.

ICA at § 3.

Nowhere does the integrated ICA state that the marketing budget would be fulfilled by assigning a dedicated marketing person to the Sheppards.  And the Sheppards have adduced no evidence that Compass failed to meet its commitment of $10,000 in a marketing budget.

As set forth *supra*, the Tribunal found that the Sheppards had proved that Ms. Pegnim misrepresented the availability of a dedicated marketing agent.  But that doesn't mean that the language in the ICA can be interpreted in any way other than that Compass would provide the Sheppards with $10,000 in a marketing *budget.*

Compass did not breach the ICA's marketing budget provision.

    5.   *The clawback of $3000.*

The Sheppards contend that Compass withheld $3000 in Mr. Sheppard's commissions when he disassociated from Compass.   On this basis, they allege that Compass breached §1 of the ICA, the commission split provision.  But the evidence shows that something entirely different occurred.  Yes, Compass at least initially withheld $3000.  But it withheld $3000 of the marketing incentives it had advanced to him.

The following ICA provision applied to clawbacks:

- Upon termination of the ICA . . . as the result of Agent's voluntary
  disaffiliation, within 1 year(s) of Agent's actual receipt of any
  Incentive(s) (other than Agent Split) pursuant to the ICA,
  Agent agrees to repay Broker such Incentive(s) except Agent's
  Office Subsidy and Agent Split, received by Agent  pursuant to the ICA.

Todd Sheppard's April 2019 ICA at p. 1.

Mr. Sheppard signed the 2019 ICA in April 2019. He disassociated from Compass in June 2020. He had received incentives less than a year before he left. Thus, the clawback provision applied to him.

Compass initially sought an incentive refund of $19,825.81, which it calculated based on the value of the advanced incentives. After some internal debate and correspondence with Mr. Sheppard, it reduced that amount to $3000. On November 24, 2020, Libby Leffler, Regional President, Northern California, wrote to Mr. Sheppard:

> As the Regional President of Compass NorCal, please accept this email as verification that $3,000.00 will be accepted as payment in full for the clawback balance invoiced at $19,825.81.
>
> Peter Jonas had agreed to reduce the clawback balance to the marketing portion, which was $9,500. However, it is best to be clear on the entire amount to be forgiven, so that we are all on the same page as we move forward.
>
> Anita will work with our Finance department tomorrow to make sure the commission demand on Newanga Avenue is revised to both of your satisfaction.

Mr. Sheppard testified that Compass withheld his Newanga commission. But Ms. Leffler's letter states that Compass would ensure "the commission demand on Newanga Avenue" was revised. The Sheppards offered no evidence that shows that did not occur. The Tribunal has no way of knowing whether the withheld commission was used as a set-off for the clawback of incentives that Mr. Sheppard agreed to pay or whether Compass paid the commission and wrote a check for that amount.

Compass did not breach the commission split provision, §1 of the ICA. Per Mr. Sheppard's 2019 ICA, Compass was entitled to clawback any incentives paid within one

year of his disassociation.  Mr. Jonas testified that Mr. Sheppard agreed to the clawback of $3000, which was reduced from the original $19,825.81 Compass claimed Mr. Sheppard owed.

       D.      <u>Section 17200</u>.

The Sheppards' complaint predicated the Cal. Bus. & Prof. Code §17200 cause of action on their Labor Code claims and on Cal. Bus. & Prof. Code §§10145 *et al.  See Sheppard & Sheppard v. Compass, Inc. et al Complaint for Damages,* dated April 29, 2021 at ¶¶ 89 − 93.   Section 10145 requires that a real estate broker "who accepts funds belonging to others in connection with a transaction that are not immediately placed into a neutral escrow depository" place those funds into the hands of the broker's principal or into a trust fund account.

The Sheppards voluntarily dismissed their Labor Code causes of action.  They have adduced no evidence that Compass violated §10145.  The §17200 claim derivative of the dismissed Labor Code cause of action fails because there is no underlying violation of the Labor Code.   The §17200 claim based on a violation based on §10145 fails for want of evidence.

       E.      <u>Damages</u>.

It is axiomatic that a finding of liability is required for any award of damages.  *See* Cal. Civ. Code §§ 3281, 3300.   Because the Sheppards have failed to meet their burden of proof on any of their causes of action, no liability attaches to Compass, and there is no basis for an award of damages.

VIII.    AWARD

Respondents Compass, Inc. and Compass California II are the prevailing parties. The Sheppards have failed to meet their burden of proof on their causes of action for fraudulent inducement, fraud, breach of contract, and violation of Cal. Bus. & Prof. Code §17200.

The administrative fees and expenses of the American Arbitration Association totaling $10,550.00 shall be borne as incurred, and the compensation of the Arbitrator totaling $52,077.41 shall be borne as incurred.

This Final Award is in full satisfaction and settlement of all claims submitted to this arbitration and disposes of each and every claim of each of the parties.  Any relief not awarded above is hereby expressly denied.

July 2, 2025

Dana Welch
Arbitrator

39